FILED
FT. SMITH DIST.
2026 MAR 18 P 1:58
CIR. CLERK SEB. CO.

IN THE CIRCUIT COURT OF SEBASTIAN COUNTY, ARKANSAS

**STEVE JETTON,** on behalf of himself and all other Arkansas citizens similarly situated,

Plaintiff,

v.

**CONDUENT BUSINESS SERVICES, LLC,**

Defendant.

Case No. 66FCV-26-462 VI

**CLASS ACTION**

## CLASS ACTION COMPLAINT

Plaintiff Steve Jetton ("Plaintiff"), on behalf of himself and all other Arkansas citizens similarly situated brings this Class Action Complaint against Conduent Business Services, LLC ("Conduent" or "Defendant"), and alleges, upon personal knowledge as to his own actions and his counsel's investigations, and upon information and belief, as follows:

EXHIBIT A

## INTRODUCTION

1. Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard personal identifiable information ("PII")[1], and personal health information ("PHI") of individuals and businesses, including, but not limited to, names, social security numbers, medical information, and health information.

2. Conduent is a digital business services company based out of Florham Park, New Jersey serving many businesses across the healthcare sphere.

3. On or about October 24, 2025, Conduent filed official notices of a hacking incident with multiple attorney general offices, including Oregon, Washington, and Maine.

4. Around the same day, Conduent began the lengthy process of sending letters to individuals affected by the data incident.

5. These letters describe that on January 13, 2025, Conduent discovered that they were a victim of a "cyber incident" and that an unauthorized third party had access to their environment from October 21, 2024, to January 13, 2025 (the "data incident" or "Data Breach"). Conduent was on notice of this data incident for over ten (10) months before notifying affected patients. Notably, Plaintiff himself did not receive notice until nearly a year after the discovery of the data incident.

6. By obtaining, collecting, using, and deriving a benefit from the PII and PHI

---

[1] Pursuant to the Arkansas Personal Information Protection Act, personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. A.C.A. § 4-110-103(7).

of Plaintiff and the Class, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

7. Plaintiff bring this action on behalf of all Arkansans whose PII and PHI was compromised as a result of Defendant's failure to: (i) adequately protect the PII and PHI; (ii) warn of Defendant's inadequate information security practices; (iii) effectively secure hardware containing protected PII and PHI using reasonable and effective security procedures free of vulnerabilities and incidents; and (iv) timely notify Plaintiff and the Class of the incident.

8. Plaintiff and the Class have suffered injury because of Defendant's conduct. These injuries include: (i) lost or diminished value of PII and PHI; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII and PHI; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the data incident including but not limited to lost time, (iv) the disclosure of their private information, and (v) the continued and certainly increased risk to their PII and PHI, which seemingly remains available for unauthorized third parties to access and abuse; and may remain backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII and PHI.

9. Defendant disregarded the rights of Plaintiff and the Class by failing to take and implement adequate and reasonable measures to ensure that the PII and PHI of

Plaintiff and the Class was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, their PII and PHI was compromised through disclosure to an unauthorized third party. Further, Defendant waited ten (10) months to notify Plaintiff and the Class. Plaintiff and the Class have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

10. On behalf of himself and the Class defined herein, Plaintiff brings claims for negligence and invasion of privacy (intrusion upon seclusion). The remedies Plaintiff seek include appropriate injunctive and declaratory relief; actual, nominal, and putative damages; and attorneys' fees, costs, and expenses.

## PARTIES

11. Plaintiff Steve Jetton is a citizen and resident of Arkansas and currently resides in Barling, Sebastian County, Arkansas. Plaintiff received notice from Conduent notifying him of the data incident in a letter dated December 31, 2025.

12. Defendant is a foreign limited liability corporation incorporated in New Jersey with a principal place of business at 100 Campus Drive, suite 200, Florham Park, New Jersey 07932. Its Registered Agent for service of process is Corporation Service Company, 300 S. Spring Street, Suite 900, Little Rock, Arkansas 72201.

13. All of Plaintiff's claims stated herein are asserted against Defendant and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

## JURISDICTION AND VENUE

14. This Court has jurisdiction over this action under A.C.A. § 16-13-201(a).

15. Defendant is registered to do business in the State of Arkansas.

16. This Court has personal jurisdiction over Defendant because it conducts substantial business in Arkansas and collected and/or stored the PII and PHI of Plaintiff and the Class of Arkansans and derived substantial revenue from within the borders of Arkansas.

17. Venue is proper in this District under A.C.A § 16-60-101(a)(3)(A) because Plaintiff currently resides in Sebastian County and resided in Sebastian County at the time of Defendant's wrongful actions giving rise to this Complaint.

## FACTUAL ALLEGATIONS

18. Defendant collected the PII and PHI of Plaintiff and the Class and stored it on Defendant's internet-accessible network.

19. Plaintiff and the Class relied on this sophisticated Defendant to keep their PII and PHI confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

20. Defendant had a duty to adopt reasonable measures to protect the PII and PHI of Plaintiff and the Class from involuntary disclosure to third parties.

21. Beginning in October 2025, Defendant began mailing letters titled "*Notice*

*of Data Incident*" ("Notice Letter") informing Plaintiff and other Class Members of the following:

Dear _______ :

On behalf of our clients, Conduent Business Services, LLC ("Conduent") provides third-party printing/mailroom services, document-processing services, payment integrity services, and other back-office support services. We are writing to inform you about a recent incident experienced by Conduent that may have involved some of your personal information, which came into our possession due to the services that we provide to your current or former health plan. While we are unaware of any attempted or actual misuse of any information involved in this incident, we are providing you with information about the incident and steps you can take to protect yourself, should you feel it necessary.

**What Happened?**

On January 13, 2025, we discovered that we were the victim of a cyber incident that impacted a limited portion of our network. We immediately secured our networks and initiated an investigation with the assistance of third-party forensic experts. Our investigation determined that an unauthorized third party had access to our environment from October 21, 2024, to January 13, 2025, and obtained some files associated with your current or former health plan. Given the nature and complexity of the data involved, Conduent has been working diligently with a dedicated review team,

including internal and external experts, to conduct a detailed analysis of the affected files to identify the personal information contained therein. We are providing you with this notice upon the recent conclusion of this time-intensive data analysis as your personal information was contained in the affected files.

**What Personal Information Was Involved.**

The affected files contained your name and the following: Address and Social Security number. Presently, we have no evidence or indication of actual or attempted misuse of your personal information

**What We Are Doing.**

Upon discovery of the incident, we safely restored om systems and operations and notified law-enforcement. We are also notifying you in case you decide to take further steps to protect your information should you feel it appropriate to do so. In addition, we are providing you with access to 12 months of credit monitoring and identity restoration services through Epiq at no charge to you. You must enroll by April 30, 2026.

**What You Can Do.**

Please review the enclosed "Steps You Can Take to Help Protect Your Information" which describes the services we are offering, how to activate them, and provides further details on how to protect yourself. We encourage you to remain vigilant against the potential for identity theft and fraud and to monitor your credit reports for any suspicious activity.

**For More Information.**

We sincerely regret any issue this incident may have caused you. If you have additional questions, you may call our dedicated assistance line at 877-332-1658 (toll-free), Monday-Friday, from 9:00 a.m. to 9:00 p.m. Eastern Time, or write to us at Attn: Data Incident, 100 Campus Drive, Suite 200, Florham Park, New Jersey 07932.

Sincerely,
Conduent Business Services, LLC

22. Omitted from the Notice Letter were the identity of the cybercriminals who perpetrated the data breach, the details of the root cause of the incident, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these omitted details have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

23. This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the data incident's critical facts. Without these details, Plaintiff and Class Members' ability to mitigate the harms resulting from the data incident is severely diminished.

24. Defendant had obligations to keep Plaintiff and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

25. Defendant did not use reasonable security procedures and practices

appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information.

26. The attackers accessed and acquired files containing unencrypted Private Information of Plaintiff and Class Members. Plaintiff and the Class Members' Private Information was accessed and stolen in the data incident.

***Data Breaches Are Preventable***

27. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

28. Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

29. To prevent and detect cyber-attacks and/or ransomware attacks, Defendant could and should have implemented the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[2]

Office[Visual Basic for Applications].[3]

30. To prevent and detect cyber-attacks or ransomware attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

---

[2] *Id.* at 3-4.

[3] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/

**Secure Internet-Facing Assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for

31. Defendant could and should have implemented all the above measures to prevent and detect cyberattacks.

32. The occurrence of the data incident indicates that Defendant failed to

adequately implement one or more of the above measures to prevent cyberattacks, resulting in the data incident and data thieves acquiring and accessing the Private Information of Arkansans, including that of Plaintiff and Class Members.

***Defendant Acquires, Collects, Stores the Private Information of Patients for its Clients.***

33. Defendant acquires, collects, and stores a massive amount of Private Information of the current and former patients of its clients. It does this through contracting with medical providers to store this data, for profit.

34. By obtaining, collecting, and using Plaintiff and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff and Class Members' Private Information from disclosure.

35. Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and would not have entrusted it to Defendant absent a promise to safeguard that information.

36. Upon information and belief, while collecting Private Information from patients, including Plaintiff, Defendant promised to provide confidentiality and adequate security for their data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

37. Plaintiff and the Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

***Defendant Knew, Or Should Have Known, of the Risk Because Entities in Possession of Private Healthcare Information Are Particularly Susceptible to Cyber Attacks***

38. Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting entities that collect and store Private healthcare Information, like Defendant, preceding the date of the breach.

39. Data breaches, including those perpetrated against healthcare entities that store Private Information in their systems, have become widespread.

40. In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims. Of the 3,205 recorded data compromises, 809 of them, or 25.2% were in the medical or healthcare industry. The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1400 percentage points. The 2023 compromises represent a 78-percentage point increase over the previous year and a 72-percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.

41. In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including Change Healthcare Inc. (145 million records, February 2024), Kaiser Foundation Health Plan, Inc. (13 million records, April 2024), Ascension Health (5.6 million records, May 2024), HealthEquity, Inc. (4.3 million records, March 2024), and Acadian Ambulance Service, Inc. (2.8 million records, June 2024), Defendant knew or should have known that its electronic records would be targeted by

cybercriminals.

42. Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store Private Information are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[4]

43. Additionally, as companies became more dependent on computer systems to run their business,[5] *e.g.*, working remotely because of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[6]

44. Defendant knew and understood unprotected or exposed Private Information in the custody of companies, like Defendant, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that Private Information through unauthorized access.

45. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system

---

[4] https://www.law360.com/patientprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=patientprotection
[5] https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html

[6] https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022

was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

46. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

47. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

48. The ramifications of Defendant's failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen--particularly Social Security numbers and PHI--fraudulent use of that information and damage to victims may continue for years.

49. As a healthcare data custodian of the Private Information of millions of patients, Defendant knew, or should have known, the importance of safeguarding Private Information entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members because of a breach. Defendant failed, however, to take adequate cybersecurity measures to prevent the data incident.

***Value Of Private Information***

50. The PII and PHI of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark

web pricing for stolen identity credentials.[7]

51. For example, Personal Information can be sold at a price ranging from $40 to $200.[8] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[9]

52. Of course, a stolen Social Security number – standing alone – can be used to wreak untold havoc upon a victim's personal and financial life. The popular personal privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social Security Number," including 1) Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from your accounts, and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud; 2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft, which involves using someone's stolen Social Security number as a "get out of jail free card;" 4) Medical Identity Theft, and 5) Utility Fraud.

53. It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers, which were compromised for some Class Members in the data incident, are among the worst kind of

---

[7] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/

[8] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/

[9] *In the Dark,* VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

Private Information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

54. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases." [10] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[11]

55. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[12]

56. In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[13] "Someone who has your SSN can

[10] *See* www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases.

[11] *Id.*

[12] Social Security Administration, *Identity Theft and Your Social Security Number, available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf

[13] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/

use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[14]

57. What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

58. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[15]

59. Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[16]

60. The greater efficiency of electronic health records brings the risk of privacy breaches. These electronic health records contain a lot of sensitive information (*e.g.*,

---

[14] *See* https://www.investopedia.com/terms/s/ssn.asp

[15] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft

[16] *Medical I.D. Theft*, EFraudPrevention https://efraudprevention.net/home/education/?a=187#:~:text=A%20thief%20may%20use%20your,credit%20report%20may%20be%20affected. (last visited Nov. 6, 2023).

patient data, patient diagnosis, lab results, medications, prescriptions, treatment plans, etc.) that is valuable to cybercriminals. One patient's complete record can be sold for hundreds of dollars on the dark web. As such, PHI/PII is a valuable commodity for which a "cyber black market" exists where criminals openly post stolen payment card numbers, Social Security numbers, and other personal information on several underground internet websites. Unsurprisingly, the pharmaceutical industry, similar to the healthcare sector, is at high risk and is acutely affected by cyberattacks.

61. Between 2005 and 2019, at least 249 million people were affected by healthcare data breaches.[17] Indeed, during 2019 alone, over 41 million healthcare records were exposed, stolen, or unlawfully disclosed in 505 data breaches.[18] In short, these sorts of data breaches are increasingly common, especially among healthcare systems, which account for 30.03 percent of overall health data breaches, according to cybersecurity firm Tenable.[19]

62. According to account monitoring company LogDog, medical data sells for $50 and up on the Dark Web.[20]

63. "Medical identity theft is a growing and dangerous crime that leaves its

---

[17] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B5-healthcare-08-00133/ (last accessed July 24, 2023).

[18] https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/ (last accessed July 24, 2023).

[19] https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-incovid-19-era-breaches/ (last accessed July 24, 2023).

[20] Lisa Vaas, *Ransomware Attacks Paralyze, and Sometimes Crush, Hospitals*, Naked Security (Oct. 3, 2019), https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content (last accessed July 20, 2021).

victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[21]

64. A study by Experian found that the average cost of medical identity theft is "about $20,000" per incident and that most victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive to restore coverage.[22] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third of medical identity theft victims saw their insurance premiums rise, and 40 percent were never able to resolve their identity theft at all.[23]

65. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[24]

66. Based on the foregoing, the information compromised in the data incident is significantly more valuable than the loss of, for example, credit card information in a

---

[21] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/ (last accessed July 24, 2023).

[22] *See* Elinor Mills, "Study: Medical Identity Theft is Costly for Victims," CNET (Mar, 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last accessed July 24, 2023).

[23] *Id.; see also Healthcare Data Breach: What to Know About them and What to Do After One*, EXPERIAN, https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-toknow-about-them-and-what-to-do-after-one/ (last accessed July 24, 2023).

[24] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html

retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

67. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

68. The fraudulent activity resulting from the data incident may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and between when Private Information is stolen and when it is used.

69. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

*Defendant Failed To Comply With Industry Standards*

70. As noted above, experts studying cyber security routinely identify healthcare entities in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

71. Several best practices have been identified that, at a minimum, should be implemented by entities in possession of Private Healthcare Information, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making

data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

72. Other best cybersecurity practices that are standard for healthcare information-storing entities include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

73. These foregoing frameworks are existing and applicable industry standards for private healthcare-storing entities, and upon information and belief, Defendant failed to comply with at least one--or all--of these accepted standards, thereby opening the door to the threat actor and causing the data incident.

*Common Injuries & Damages*

74. As a result of Defendant's ineffective and inadequate data security practices, the data incident, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of

the data incident; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the data incident; (vi) nominal damages; and (vii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

***Data Breaches Increase Victims' Risk Of Identity Theft***

75. The unencrypted Private Information of Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers.

76. Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members. Simply put, unauthorized individuals can easily access the Private Information of Plaintiff and Class Members.

77. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

78. Plaintiff and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the data incident has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and

Class Members and to profit off their misfortune.

79. "Despite the risk of fraud associated with the theft of Social Security numbers, just five of the nation's largest 25 banks have stopped using the numbers to verify a patient's identity after the initial account setup[.]"[25] Accordingly, since Social Security numbers are frequently used to verify an individual's identity after logging onto an account or attempting a transaction, "[h]aving access to your Social Security number may be enough to help a thief steal money from your bank account"[26]

80. One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[27]

81. With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

---

[25] *See* https://archive.nytimes.com/bucks.blogs.nytimes.com/2013/03/20/just-5-banks-prohibit-use-of-social-security-numbers/

[26] *See* https://www.credit.com/blog/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/

[27] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/

82. The development of "Fullz" packages means here that the stolen Private Information from the data incident can easily be used to link and identify it to Plaintiff and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the data incident, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

83. The existence and prevalence of "Fullz" packages means that the Private Information stolen from the data incident can easily be linked to the unregulated data (like contact information) of Plaintiff and the other Class Members.

84. Thus, even if certain information (such as contact information) was not stolen in the data incident, criminals can still easily create a comprehensive "Fullz" package.

85. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

*Loss Of Time To Mitigate Risk Of Identity Theft & Fraud*

86. As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise

mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm - yet the resource and asset of time has been lost.

87. Due to the actual and imminent risk of identity theft, Defendant, in its Notice Letter instructs Class Members to review an additional pamphlet to learn measures to protect themselves: "review the enclosed 'Steps You Can Take to Help Protect Your Information."

88. Defendant's extensive suggestion of steps that Plaintiff and Class Members must take to protect themselves from identity theft and/or fraud demonstrates the significant time that Plaintiff and Class Members must undertake in response to the data incident. Plaintiff and Class Members' time is highly valuable and irreplaceable, and accordingly, Plaintiff and Class Members suffered actual injury and damages in the form of lost time that they spent on mitigation activities in response to the data incident and at the direction of Defendant's Notice Letter.

89. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the data incident. Accordingly, the data incident has caused Plaintiff and Class Members to suffer actual injury in the form of lost time—which cannot be recaptured—spent on mitigation activities.

***Diminution of Value of Private Information***

90. PII and PHI are valuable property rights. Their value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber

thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

91. Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[28]

92. An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[29]

93. In fact, the data marketplace is so sophisticated that patients can sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[30,31]

94. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[32]

95. Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[33]

---

[28] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[29] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/

[30] https://www.latimes.com/business/story/2019-11-05/column-data-brokers

[31] https://datacoup.com/

[32] https://digi.me/what-is-digime/

[33] *Medical I.D. Theft*, EFraudPrevention https://efraudprevention.net/home/education/?a=187#:~:text=A%20thief%20may%20use%20your,cred

96. As a result of the data incident, Plaintiff and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

97. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

98. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

99. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

***Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary***

100. Given the type of targeted attack in this case, sophisticated criminal activity,

it%20report%20may%20be%20affected. (last visited Nov. 6, 2023).

and the type of Private Information involved, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes –*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

101. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that their Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

102. Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

103. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.

***Plaintiff Steve Jetton's Experience***

104. Plaintiff Steve Jetton had personal data stored through Defendant acting as a data vendor. As a condition of receiving care, Plaintiff was required to supply Defendant's clients with his Private Information. This client(s) then, in turn, partnered with Defendant to store the personal data.

105. At some time during the data incident—October 2024 to January 2025—Defendant maintained Plaintiff's Private Information in its system.

106. Plaintiff is very careful about sharing his sensitive Private Information. Plaintiff stores any documents containing his Private Information in a safe and secure location. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have allowed nor entrusted his Private Information to Defendant had he known of Defendant's lax data security policies.

107. To the best of Plaintiff's knowledge, neither his PII nor PHI has been compromised in a prior data breach.

108. Plaintiff suffered actual injury from having his Private Information compromised as a result of the data incident including, but not limited to: (i) invasion of privacy; (ii) theft of his Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the data incident; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the data incident; (vi) nominal damages; and (vii) the continued and certainly increased risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

109. The data incident has caused Plaintiff to suffer fear, anxiety, and stress,

which has been compounded by the fact that Defendant has still not fully informed Plaintiff of key details about the data incident's occurrence and details of its severity.

110. As a result of the data incident, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

111. Plaintiff has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ALLEGATIONS

112. Plaintiff bring this class action on behalf of himself, and all other Arkansas citizens similarly situated pursuant to Arkansas Rule of Civil Procedure 23.

113. The Class that Plaintiff seeks to represent is defined as follows:

> All citizens of Arkansas whose PII and/or PHI was compromised in the (2024-2025) Conduent Business Services Data Breach, including all Arkansas Citizens who received a data breach notification from Defendant.
>
> Excluded from the Class are the following:
>
> (a) Any of the named Defendants, their directors, officers, employees, and/or agents
> (b) The judge presiding over this action and his/her immediate family members; and,
> (c) Any person that timely and properly excludes himself/herself/itself pursuant to the orders of the court.

114. Plaintiff reserves the right to modify or amend the definition of the Class before the Court determines whether certification is appropriate.

115. *Numerosity*, Ark. R. Civ. P. 23(a)(1): The Class is so numerous that joinder of all members is impracticable. The Supreme Court of Arkansas has held that a class with as few as 36 members is sufficient to satisfy Rule 23's numerosity requirement. *Stephens Prod. Co. v. Mainer*, 2019 Ark. 118, at 5, 571 S.W.3d 905, 908 (2019). Upon information and belief, at least 36 Arkansans are members of the Class, but such identifying information is within the exclusive possession of Defendant.

116. *Commonality*, Ark. R. Civ. P. 23(a)(2) and (b): Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include, *inter alia*:

a. Whether Defendant failed to timely notify Plaintiff and the class of the Data Incident;

b. Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c. Whether Defendant's security measures to protect their data systems were reasonable considering best practices recommended by data security experts;

d. Whether Defendant's failure to institute adequate protective security measures amounted to negligence; and,

e. Whether Defendant failed to take commercially reasonable steps to safeguard Class Members' Private Information.

117. Defendant engaged in a common course of conduct giving rise to the legal

rights sought to be enforced by Plaintiff on behalf of himself and all other Class Members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

118. *Typicality*, Ark. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members because all had their PII and/or PHI compromised because of the data incident, due to Defendant's misfeasance.

119. *Policies Generally Applicable to the Class*: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

120. *Adequacy*, Ark. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of Class Members in that he has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiff have retained counsel experienced in complex class action litigation, and Plaintiff intend to prosecute this action vigorously.

121. *Predominance and Superiority*, Ark. R. Civ. P. 23(b): Class litigation is an

appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit many Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

122. The nature of this action and the nature of laws available to make the use of the class action device as a particularly efficient and appropriate procedure to afford relief to for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

**COUNT I**
**Negligence**
**(On Behalf of Plaintiff and the Class)**

123. Plaintiff re-alleges and incorporates by reference all preceding allegations, as if fully set forth herein.

124. Defendant, with its clients, require patients, including Plaintiff and Class Members, to submit non-public Private Information in the ordinary course of providing its services.

125. Defendant gathered and stored the Private Information of Plaintiff and Class Members as part of its business of soliciting its services to its clients, which solicitations and services affect commerce.

126. Plaintiff and Class Members entrusted Defendant with their Private Information with the understanding that Defendant would safeguard their information.

127. Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information were wrongfully disclosed.

128. By voluntarily undertaking and assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period and to give prompt

notice to those affected in the case of a data breach.

129. Defendant had a duty to employ reasonable security measures under the law and to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks adequately protected the Private Information.

130. Defendant's duty of care to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and Class Members. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential Private Information, a necessary part of doing business with the clients of Defendant.

131. Defendant's duty to use reasonable care in protecting confidential data arose not only because of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

132. Moreover, Defendant had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

133. Defendant had and continues to have a duty to adequately disclose that the Private Information of Plaintiff and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

134. Defendant waited ten months to even begin issuing notice.

135. Defendant breached its duties and was negligent by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of their networks and systems;

c. Allowing unauthorized access to Class Members' Private Information;

d. Failing to detect in a timely manner that Class Members' Private Information had been compromised;

e. Failing to remove former patients' Private Information it was no longer required to retain pursuant to regulations, and

f. Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

136. A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

137. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

138. Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and the Class could and would suffer if the Private Information were wrongfully disclosed.

139. Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiff and the Class, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendant's systems or transmitted through third party systems.

140. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

141. Plaintiff and the Class had no ability to protect their Private Information that was in, and possibly remains in, Defendant's possession.

142. Defendant was in a position to protect against the harm suffered by Plaintiff and the Class because of the Data Breach.

143. Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard

personal information.

144. Defendant has admitted that the Private Information of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the data incident.

145. But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the Private Information of Plaintiff and the Class would not have been compromised.

146. There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The Private Information of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

147. As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further

unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

148. Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

149. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

**COUNT II**
**Intrusion Upon Seclusion/Invasion of Privacy**
**(On Behalf of Plaintiff and the Class)**

150. Plaintiff realleges and incorporates by reference herein all the preceding allegations above as if fully alleged herein.

151. Plaintiff brings this claim individually and on behalf of the Class.

152. Plaintiff had a reasonable expectation of privacy in the PII and PHI Defendant mishandled.

153. Defendant's conduct as alleged above intruded upon Plaintiff and Class Members' seclusion under common law.

154. By intentionally failing to keep Plaintiff and Class Members' PII and PHI safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendant intentionally invaded Plaintiff and Class Members' privacy by:

a. Intentionally and substantially intruding into Plaintiff and Class Members' private affairs in a manner that identifies them and that would be highly offensive and objectionable to an ordinary person;

b. Deliberately neglecting to implement security protocol such that private facts about Plaintiff and the Class were publicized, which is highly offensive and objectionable to an ordinary person; and,

c. Intentionally causing anguish or suffering to Plaintiff.

155. Defendant knew that an ordinary person in Plaintiff and Class Members' position would consider Defendant's intentional actions highly offensive and objectionable.

156. Defendant invaded Plaintiff and Class Members' right to privacy and intruded into Plaintiff and Class Members' private affairs by intentionally misusing and/or disclosing their PII and/or PHI without their informed, voluntary, affirmative, and clear consent.

157. Defendant intentionally concealed from and delayed reporting the security incident that misused and/or disclosed PII and PHI to the Class for 10 months, (and nearly a year for Plaintiff).

158. The conduct described above was at or directed at Plaintiff and the Class.

159. As a proximate result of such intentional misuse and disclosures, Plaintiff and Class Members' reasonable expectations of privacy in their PII and PHI was unduly frustrated and thwarted. Defendant's conduct amounted to a substantial and serious invasion of Plaintiff and Class Members' protected privacy interests causing anguish and suffering such that an ordinary person would consider Defendant's intentional actions or inaction highly offensive and objectionable.

160. In failing to protect Plaintiff and Class Members' PII and PHI, and in

intentionally misusing and/or disclosing their PII and PHI, Defendant acted with intentional malice and oppression and in conscious disregard of Plaintiff and Class Members' rights to have such information kept confidential and private. Plaintiff, therefore, seeks an award of damages on behalf of himself and the Class.

161. As a direct and proximate result of Defendant's conduct, Plaintiff and the Class are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**COUNT III**
**Declaratory Judgment**
**(On Behalf of Plaintiff and the Class)**

162. Plaintiff realleges and incorporates by reference herein all the preceding allegations above as if fully alleged herein.

163. Under A.C.A. § 16-111-101, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Further, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

164. An actual controversy has arisen in the wake of the data incident regarding Plaintiff and Class Members' PII and PHI and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff from further data breaches that compromise their information. Plaintiff alleges that Defendant's data security measures remain inadequate. Defendant will contend otherwise as evidenced in its Notice Letter: "we safely secured our systems and operations." Furthermore, Plaintiff

and the Class continue to suffer injury because of the compromise of their PII and PHI and remain at imminent risk that further compromises of their information will occur in the future. It is unknown what specific measures and changes Defendant has undertaken in response to the data incident.

165. Plaintiff and Class Members have an ongoing, actionable dispute arising out of Defendant's inadequate security measures, including (i) Defendant's failure to encrypt Plaintiff and Class Members' PII and PHI including Social Security numbers, while storing it in an Internet-accessible environment and (ii) Defendant's failure to delete PII and PHI it has no reasonable need to maintain in an Internet- accessible environment, including the Social Security number of Plaintiff.

166. Pursuant to its authority under A.C.A. § 16-111-101, *et seq.*, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owes a legal duty to secure the PII and PHI of Plaintiff and the Class;
b. Defendant continues to breach this legal duty by failing to employ reasonable measures to secure PII and PHI; and
c. Defendant's ongoing breaches of its legal duty continue to cause Plaintiff's harm.

167. This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry and government regulatory standards to protect consumers' PII and PHI. Specifically, this injunction should, among other things, direct Defendant to:

a. engage third party auditors, consistent with industry standards, to test its systems for weakness and upgrade any such weakness found;

b. audit, test, and train its data security personnel regarding any new or modified procedures and how to respond to a data breach;

c. regularly test its systems for security vulnerabilities, consistent with industry standards;

d. implement an education and training program for appropriate employees regarding cybersecurity.

168. If an injunction is not issued, Plaintiff will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendant. The risk of another such breach is real, immediate, and substantial. If another breach at Defendant occurs, Plaintiff and Class members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

169. The hardship to Plaintiff if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

170. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Defendant, thus eliminating the additional injuries that would result to Plaintiff and Class Members whose confidential information would be further compromised.

## JURY TRIAL DEMANDED

171. Plaintiff demands a jury of twelve on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all other Arkansas citizens similarly situated, pray for an Order certifying the Class and appointing Plaintiff and his counsel to represent the interest of the Class Members, judgment against Defendant and in favor of Plaintiff and the Class awarding them compensatory and punitive damages, their attorneys' fees and costs of litigation, pre- and post-judgment interest, injunctive relief, and all other fair and just relief.

DATED: March 16, 2026

Respectfully submitted,

Scott Poynter, Ark. Bar No. 90077
scott@poynterlawgroup.com
Clay Ellis, Ark. Bar No. 2023183
clay@poynterlawgroup.com
Will Sumner, Ark. Bar no. 2026007
will@poynterlawgroup.com
**POYNTER LAW GROUP**
4924 Kavanaugh Blvd.
Little Rock, AR 72207
(501) 812-3943

Marc H. Edelson *
medelson@edelson-law.com
**EDELSON LEHTZIN LLP**
411 S. State Street, Suite N300
Newtown, PA 18940
(215) 867-2399

** Pro hac vice motion forthcoming*

*Attorneys for Plaintiff and the Putative Class*